AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
Middle District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| LING WANG | ) | |
| SHOUXIN LUO | ) | 6:26-mj- 1890 |
| XIAOWEI LIN, | ) | |
| HUASHAN LU, | ) | |
| YUXIANG ZHAO, | ) | |
| YONGBO LI | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ June 5, 2026 _____ in the county of _____ Orange County _____ in the _____ Middle _____ District of _____ Florida _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1349 | Conspiracy to Commit Mail Fraud |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Charles Johnsten, U.S. Postal Inspector
_____
*Printed name and title*

Sworn to before me over the ~~telephone~~ in person or other reliable electronic means and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d).

Date: 7/29/26

_____
*Judge's signature*

City and state: _____ Orlando, FL _____

LESLIE HOFFMAN PRICE, U.S. Magistrate Judge
_____
*Printed name and title*

STATE OF FLORIDA          CASE NOS.        6:26-mj- **1890**

COUNTY OF ORANGE

### MASTER AFFIDAVIT IN SUPPORT OF
### THE ISSUANCE OF SIX CRIMINAL COMPLAINTS

I, Charles Johnsten, being duly sworn, state as follows:

### I.      INTRODUCTION AND AGENT BACKGROUND

1.      I submit this master affidavit in support of the issuance of criminal complaints and arrest warrants for Ling Wang ("WANG"), Shouxin Luo ("LUO"), Xiaowei Lin ("LIN"), Huashan Lu ("LU"), Yuxiang Zhao ("ZHAO"), and Yongbo Li ("LI") (collectively, the "SUBJECTS") for committing the federal offense of Conspiracy to Commit Mail Fraud, in violation of 18 U.S.C. § 1349.

2.      I am a Postal Inspector with the United States Postal Service (USPS) and have been so employed since December 2016. I am currently assigned to the Orlando, Florida Domicile. Prior to December 2016, I was a Special Agent with the United States Secret Service for nine years, assigned to the Orlando Field Office. Among my duties as a Postal Inspector, I investigate financial crimes, including identity fraud, mail theft, mail fraud, bank fraud, wire fraud, and the use of counterfeit and fraudulent access devices, such as credit cards, debit cards, and gift cards. I also investigate burglaries of USPS property and Robberies of USPS employees.

3.      The information in this affidavit is based upon my personal knowledge, information obtained from other law enforcement personnel, information obtained

from corporate investigators, and information obtained from financial and other banking institutions.

4. This affidavit is intended to show only that there is sufficient probable cause for the requested warrants and complaints and does not set forth all of my knowledge about this matter.

## II. PROBABLE CAUSE

### SCHEME SUMMARY

5. This investigation involves an organized fraud scheme in which individuals who are unknown to the targeted victims impersonate legitimate businesses, financial institutions, government agencies, or other trusted entities to gain the victims' confidence, most of whom are elderly, and induce the victims to transfer funds.

6. The suspects typically initiate contact through telephone calls, emails, and internet pop-up messages, falsely claiming the victim's financial accounts or personal information have been compromised and that immediate action is required. Victims are instructed to maintain secrecy throughout the process and are directed to withdraw funds, purchase cashier's checks, initiate wire transfers, or mail U.S. currency to resolve the fabricated issue.

7. As part of the scheme, victims have been instructed to obtain cashier's checks payable to Palmedge Construction, LLC, Ironpalm Builders, LLC , Vita Builders, LLC, and Vex Builders, LLC and mail the checks to addresses associated

with those businesses. Investigative efforts have identified multiple commercial mailbox locations believed to be used by individuals participating in the scheme.

8.    The following mailing addresses, all located in the Middle District of Florida, have been identified as parcel recipient locations associated with the investigation:

    a.  424 E. Central Boulevard, P.O. Box 120, Orlando, Florida 32801;

    b.  2423 S. Orange Avenue, P.O. Box 389, Orlando, Florida 32806;

    c.  127 W. Fairbanks Avenue, P.O. Box 530, Winter Park, Florida 32789;

    d.  1705 Edgewater Drive, Orlando, Florida 32804; and

    e.  501 N. Orlando Avenue, Winter Park, Florida 32789.

9.    Based upon the investigation to date, the purpose of the scheme is to fraudulently induce victims to voluntarily transfer funds under false pretenses so the suspects can negotiate the proceeds and ultimately transfer the funds to financial institutions located in the People's Republic of China and Bahrain.

### VICTIM SUMMARY

10.    Throughout this investigation, over 20 victims have been identified across the United States of America. As mentioned, the majority of the victims are over the age of 65. The victims all fell for elaborately crafted scams targeting elderly individuals via email, phone calls, or pop-up advertisements on websites frequently visited by the target demographic. The majority of victims spoke over the phone with the orchestrators and were deceived into sending the money. The phone call portion

of this scheme likely originates overseas. Below is a summary of known victims whom we have spoken to or have been able to identify via financial records received:

| Victim | Approx. Age | Associated Company | Financial Loss |
|---|---|---|---|
| L.S. | Unknown | Palmedge Construction, LLC | $49,500.00 |
| M.D. | 71 | Palmedge Construction, LLC | $171,708.50 |
| M.D. | 71 | Vita Builders, LLC | $87,950.45 |
| K.N. | 60+ | Palmedge Construction, LLC | $150,000.00 |
| C.C. | 74 | Palmedge Construction, LLC | |
| E.G. | Unknown | Palmedge Construction, LLC | $84,000.00 |
| M.M. | Unknown | Palmedge Construction, LLC | $98,500.00 |
| J.D. | Unknown | Palmedge Construction, LLC | $240,000.00 |
| K.K. | Unknown | Palmedge Construction, LLC | $150,000.00 |
| A.K. | 72 | Palmedge Construction, LLC | $44,800.00 |
| Y.M. | 81/84 | Ironpalm Builders, LLC | $40,000.00 |
| M.N. | 80 | Ironpalm Builders, LLC | $56,125.00 |
| S.S. | 70–79 | Ironpalm Builders, LLC | $32,376.12 |
| K.P. | 72 | Ironpalm Builders, LLC | $30,000.00 |
| D.G. | 70 | Ironpalm Builders, LLC | $44,800.00 |
| M.B. | 82 | Ironpalm Builders, LLC | $83,150.00 |
| E.U. | 87 | Ironpalm Builders, LLC | $28,300.00 |
| C.G. | 70–79 | Ironpalm Builders, LLC | $49,500.00 |
| E.M. | Unknown | Ironpalm Builders, LLC | $53,476.00 |
| R.O. | 54 | Ironpalm Builders, LLC | $94,000.00 |
| K.G. | 66 | Ironpalm Builders, LLC | $40,000.00 |
| G.H. | 77 | Ironpalm Builders, LLC | $38,400.00 |
| T.S. | 60 | Ironpalm Builders, LLC | $90,000.00 |
| C.K. | Unknown | Ironpalm Builders, LLC | $79,000.00 |
| M.V. | Unknown | Vex Builders, LLC | 82,985 |
| B.K. | 81 | Vex Builders, LLC | Unknown-Envelope |
| D.W. | Unknown | Vex Builders, LLC | Unknown-Envelope |
| S.B. | 76 | Vex Builders, LLC | $77,000.00 |

4

11. There have been several other identified suspected victims whom we have not been able to reach regarding wire transfers or cashier checks mailed to the suspects involved in the scheme. Additionally, there are victims who advised that they were not scammed and would not comment or speak on any wire transfers or potential mail containing cashier's checks. Part of what makes this organized fraud group so successful is its versatility and usage of more than one "prompt" when speaking with potential victims, allowing for individuals from all walks of life to be brought in, some falling for being a victim of alleged fraud, others believing they were investing in crypto or gold. Part of the scheme includes advising victims not to speak with law enforcement about the details of their "investment" or situation; others may not realize they were scammed or may be too embarrassed to speak with their family members about the potential financial loss. We have identified several victims who mentioned pulling money from retirement savings as a result of this scheme. Given that several of these individuals are between 70 and 87, they are past the point of being able to recover financially from these losses, and many are unable to work or live on a fixed income. While the finances mentioned above have been wired overseas and are likely unrecoverable, it is important that the suspects do not have the ability to continue to victimize vulnerable adults in the same position as our current list of growing victims.

## INITIAL COMPLAINT OF VICTIM L.S.

12. On June 8, 2026, the Orlando Police Department received an online fraud complaint from L.S. An Orlando Police Department officer contacted the

phone number provided by L.S. and US Bank Branch Manager Maria Mercado answered the phone. Mercado explained to the officer that she was assisting L.S., who was present at the bank at the time of the officer's phone call. Mercado was attempting to place a stop payment on a cashier's check in the amount of $49,500.00. The officer spoke with both L.S. and Mercado simultaneously because the call was placed on speaker.

13.    L.S. is an elderly female that resides in McHenry, Illinois. During the call, L.S. stated:

    a.  On June 5, 2026, she was scammed via email by someone pretending to be from Apple, who claimed L.S. was a victim of porn fraud, and that warrants would be forthcoming unless L.S. paid money to resolve the problem.

    b.  L.S. was told to contact her bank and was provided with phone number 770-835-5074, extension 101.

    c.  L.S. called the phone number provided and spoke to "Skylar Liam," a supposed representative from US Bank.

    d.  After the conversation with "Skylar Liam," L.S. went to her bank and withdrew $49,500.00 in the form of a cashier's check from her savings account.

6

e. The check was made payable to Palmedge Construction LLC and mailed it to 424 E Central Boulevard, P.O. Box 120, Orlando, Florida 32801.[1]

f. "Skylar Liam" said that if L.S. mailed the check, "this would fix it and all go away."

g. L.S. was told not to say anything as "this was a secret."

h. L.S. mailed the check via the USPS Express Mail on June 5, 2026. The funds comprised the life savings of her husband and her.

14. On June 8, 2026, I was contacted by the Orlando Police Department and informed of the incident. The Postal Inspection Service was able to locate and intercept the parcel and return it to L.S.

<u>UPS Store Investigation</u>

15. On June 8, 2026, at approximately 1324 hours, law enforcement went to the UPS Store located at 424 E. Central Boulevard and confirmed the existence of P.O. Box 120.

16. UPS employees said that the mailbox was registered to WANG, of Deerfield Beach, Florida. UPS records evidenced that the mailbox was associated with Palmedge Construction, LLC, the same business to which L.S. had been instructed to make the cashier's check payable.

---

[1] The address is a UPS Store. UPS Stores often offer personal and business mailboxes, which, unlike USPS P.O. boxes, contain real street addresses.

17. When asked about the mailbox, the UPS employees immediately recognized P.O. Box 120 and stated it was routinely accessed by three individuals: WANG and two Asian males later identified as LI and LUO.

18. UPS employees stated LI had accessed the mailbox earlier on June 8, 2026. Specifically, LI entered the UPS Store at approximately 1215 hours on June 8, 2026, and retrieved packages from P.O. Box 120.

19. The following still image depicts LI entering the UPS Store on June 8, 2026 before retrieving mail from P.O. Box 120, as captured by the UPS Store surveillance system.



*Yongbo Li on UPS Store Surveillance*

8

20.     The investigation revealed indicators consistent with an organized fraud group operating in a coordinated manner rather than a single individual acting independently. Specifically:

    a.  L.S. was targeted through an impersonation scheme in which individuals posed as representatives of Apple Inc. and a financial institution, which demonstrated a structured social engineering operation.

    b.  L.S. was instructed to convert her funds into a cashier's check payable to a seemingly legitimate business entity, Palmedge Construction, LLC, and mail the funds to a commercial mailbox rather than a personal residence, indicating the deliberate use of intermediary businesses and commercial mail receiving agencies to conceal the identities of the perpetrators.

    c.  The mailbox was registered to WANG and associated with Palmedge Construction, LLC, and was regularly used by three individuals, WANG, LI, and LUO. The use of multiple individuals to control and retrieve mail from a common mailbox associated with the recipient business demonstrates coordinated activity, role delegation, and continuity of operations, all characteristics commonly associated with organized fraud groups.

    d.  Additionally, the use of a commercial mailbox, a business entity to receive fraud proceeds, multiple participants performing different

9

functions, and a repeat pattern of mail retrieval are all consistent with methods commonly employed by organized transnational fraud organizations to receive, conceal, and ultimately launder victim funds while insulating higher-level participants from direct contact with victims.

21. The UPS Store employees immediately recognized the mailbox due to its frequent use and identified WANG, LI, and LUO as regular mail recipients. Surveillance confirmed that LI accessed the mailbox on the same day the investigation began.

## ORGANIZATIONAL STRUCTURE

22. Individuals identified during the investigation and believed to be associated with the scheme include WANG, LI, LUO, LIN, ZHAO, and LU. Collectively, they have been responsible for the financial loss of over $2.2 Million U.S. Dollars from over 29 victims. The majority of the victims have been elderly. Four of the individuals identified have businesses registered in their names. Those

10

are detailed in the organizational chart below.



## YONGBO LI- OPERATIONAL COORDINATOR



11

23. LI is not listed as the owner or registered agent of any of the businesses identified during this investigation. Despite this fact, the investigation consistently identified LI as one of the most active participants in the operation and management of the fraudulent scheme because, throughout the investigation, LI was repeatedly observed conducting activities directly related to the receipt, movement, and attempted negotiation of fraud proceeds.

a. Surveillance established that LI routinely accessed commercial mailboxes utilized by Palmedge Construction, LLC, Ironpalm Builders, LLC, Vita Builders, LLC and Vex Builders, LLC, retrieved packages and mail addressed to those businesses, and transported those items to locations associated with the organization.

b. On June 8, 2026, UPS Store employees immediately recognized LI as one of the regular individuals who accessed P.O. Box 120, which was registered to WANG and associated with Palmedge Construction, LLC. Surveillance footage confirmed LI retrieving mail from the mailbox on the same day this investigation commenced.

c. Subsequent physical surveillance conducted throughout June and July 2026 repeatedly documented LI traveling with LUO, WANG, LIN, LU, and ZHAO while visiting multiple UPS Store locations, financial institutions, shared office facilities, and other locations relevant to this investigation.

d. LI was consistently observed retrieving victim packages, handling mail addressed to the shell companies, carrying backpacks and parcels believed to contain victim funds or financial documents, and acting in concert with the other identified members of the organization.

24. The investigation further demonstrated that LI routinely acted as the spokesperson for other members of the organization during banking transactions. Surveillance and bank records showed LI speaking with bank employees regarding accounts belonging to LUO, asking questions concerning frozen or restricted accounts, completing or assisting with banking paperwork, and directing other members of the organization while inside financial institutions.

a. Throughout the investigation, LI was consistently observed accompanying members of the organization while they visited Chase Bank, Bank of America, Truist Bank, Wells Fargo Bank, Fifth Third Bank, TD Bank, PNC Bank, and other financial institutions. During these encounters, LI routinely spoke on behalf of other members, inquired about frozen accounts, discussed deposits and wire transfers, and participated in transactions involving accounts associated with the shell companies identified during this investigation.

b. LI called the financial institutions named above, advising that he was the primary account holder and asked for details on various bank accounts.

13

c. Records obtained from Truist Bank further documented that LI contacted the bank and appeared to falsely represent himself as LUO while attempting to resolve issues related to a restricted business account and initiate additional international wire transfers.

25.    LI also appeared to exercise a supervisory or coordinating role during surveillance operations. On multiple occasions, he was observed directing WANG, ZHAO, and LU while they completed banking transactions or prepared financial documents. Surveillance consistently showed other members of the organization relying on LI to communicate with financial institutions, retrieve victim mail, transport financial instruments, and coordinate the group's daily activities.

26.    Recovered evidence further linked LI to victims located throughout the United States. During surveillance on June 10, 2026, LI and LUO retrieved packages from the UPS Store located at 2423 South Orange Avenue, Orlando, Florida. Shortly thereafter, LUO discarded shipping boxes. Investigators recovered the discarded shipping boxes and examined them. The packages were ultimately linked to victims in Arizona and New York, providing additional evidence of the organization's ongoing fraud scheme.

27.    On June 24, 2026, investigators again observed LI opening mail immediately after retrieving it from the UPS Store and discarding portions of the packaging while walking away from the business. Additional discarded mail recovered during that surveillance documented financial institutions had closed

14

accounts associated with members of the organization because of suspicious banking activity.

28.    Although LI is not the registered owner of any of the identified businesses, the investigation demonstrates that he performs a central operational role within the criminal enterprise. His repeated involvement in retrieving fraud proceeds, coordinating banking activity, directing other participants, communicating with financial institutions, transporting evidence of the scheme, and facilitating the movement of victim funds demonstrates that his participation extends well beyond that of an associate or courier.

29.    Based upon the totality of the investigation, I believe LI serves as one of the principal operational coordinators responsible for facilitating the day-to-day activities of the organized fraud scheme.

## XIAOWEI LIN- LOGISTIC SUPPORT



15

30.    Throughout the investigation, LIN was consistently observed accompanying the principal members of the organization and providing logistical support for the group's activities. Surveillance established that LIN routinely operated vehicles used by the organization to transport members between residences, commercial mailbox locations, financial institutions, and other locations associated with the scheme. Although LIN was not observed directly retrieving victim mail or conducting banking transactions to the same extent as LI or LUO, his repeated presence during coordinated activities, his operation of vehicles utilized by the organization, and his continued association with the other identified participants demonstrate that he knowingly facilitated the movement and daily operations of the criminal enterprise. Based upon the totality of the investigation, I believe LIN serves in a logistical support role, assisting in the transportation and coordination of members engaged in the receipt and movement of fraud proceeds.

### LING WANG – PALMEDGE CONSTRUCTION, LLC



16

31.    According to the records of the Florida Division of Corporations, WANG established Palmedge Construction, LLC in January 2026. The corporation is currently listed as "Active" and lists WANG as its sole registered agent and manager. The principal address is listed as 7350 Futures Drive, Suite 12B, Office 102, Orlando, Florida 32819.

32.    Palmedge Construction, LLC has been utilized in the furtherance of the scheme in multiple documented incidents. Specifically:

   a. In total, there is at least $1,000,000 in documented and confirmed wire transfers and cashier's checks sent to Palmedge Construction, LLC;

   b. Palmedge Construction, LLC has not been identified as a permit holder for any construction projects;

   c. Financial records identified as linked to Palmedge Construction, LLC have had substantial deposits that were transferred to bank accounts in China; and

   d. There is no indication that the company has incurred any legitimate expenses consistent with construction operations, such as purchasing materials, subcontracting, equipment, or even payroll.

Based on the totality of the investigation, Palmedge Construction, LLC appears to be operating as a shell company being used to receive and redistribute proceeds obtained through the fraudulent scheme.

33.    Bank accounts have been identified as financial accounts associated with WANG/Palmedge Construction, LLC.

17

*Bank of America Account #4873 Ling Wang/Palmedge Construction LLC*

34. Records obtained from Bank of America identified the checking account ending in 4873 as belonging to Palmedge Construction LLC (EIN 41-3972321). The account was opened on February 5, 2026, at the Waterford Lakes Branch in Orlando, Florida, in the Middle District of Florida, with an initial deposit of $100.00.

35. A review of the account activity showed that, with the exception of the $100.00 opening deposit and $1,000.00 in cash deposits, the account was funded almost entirely by victim funds received through cashier's checks and incoming wire transfers. Specifically, the account received:

   a. an $84,000.00 Wells Fargo cashier's check from victim E.G. on April 27, 2026,

   b. a $98,500.00 Arvest Bank cashier's check from victim M.M. on May 11, 2026,

   c. a $240,000.00 incoming wire from victim J.D. on May 21, 2026, and

   d. a $150,000.00 incoming wire from victim K.K. on June 2, 2026.

These transactions totaled $572,500.00 in known victim funds deposited into the account.

36. The account activity did not reflect the normal expenditures expected of a legitimate construction business. There were no observed payments for payroll, contractor labor, building materials, utilities, rent, equipment, insurance, taxes, or other ordinary business operating expenses. Aside from minimal expenditures for

Uber and food or grocery purchases, the overwhelming majority of funds leaving the account consisted of outgoing international wire transfers.

37.    Between May 4, 2026, and June 30, 2026, the account initiated seven international wire transfers totaling $552,500.00.

    a.    Two wires totaling $76,500.00 were sent to Hongkong Realpower Limited, and

    b.    Five additional wires totaling $476,000.00 were sent to Palmedge Construction LLC at 11th Floor, The Center, 99 Queens Road, Central, Hong Kong.

The total amount wired from the account closely corresponds to the amount of victim funds deposited during the same period.

38.    Based on my training and experience investigating financial crimes and money laundering, the activity within this account is consistent with the use of a funnel account. Victim funds were deposited into the account through cashier's checks and wire transfers, maintained for only a short period, and then rapidly transferred overseas through international wire transfers with little to no legitimate business activity occurring within the account. This pattern is consistent with the movement and laundering of criminal proceeds in an organized fraud scheme.

*Bank of America Account #8931, Ling Wang Personal Account*

39.    Records obtained from Bank of America identified the checking account ending in 8931 as belonging to WANG. The account was opened on April

19

15, 2024, at the Deerfield Beach Branch, Florida, and was closed on March 20, 2026, with an ending balance of $1,927.81.

40.     A review of the account activity (July 01, 2025, through June 2026) showed that the account was primarily funded through four checks issued by Yu Reflexology Inc., totaling $12,236.00. The checks consisted of a $2,200.00 deposit on October 2, 2025; a $4,000.00 deposit on November 3, 2025; a $3,000.00 deposit on November 30, 2025; and a $3,036.00 deposit on December 22, 2025.

41.     The transaction history does not reflect the spending patterns typically associated with a personal checking account. There were few expenditures for common living expenses such as groceries, fuel, utilities, rent or mortgage payments, insurance, medical expenses, or other routine household purchases. Instead, the outgoing transactions consisted of six Zelle transfers totaling $5,200.00 to accounts held by various individuals, three payments totaling $429.64 to another Bank of America account ending in 0081, and six payments totaling $2,550.00 to JMC Quality Builders Corporation and LMG Development.

42.     Based on my training and experience investigating financial crimes, the activity within this account is inconsistent with the normal use of a personal checking account. Rather than being used to pay ordinary living expenses, the account appears to have been used primarily to receive deposits and quickly redistribute funds through electronic transfers and payments to businesses with no readily apparent personal purpose. This pattern is consistent with an account being used to facilitate the movement of funds rather than for legitimate personal banking

20

activities and may represent an account utilized to support the broader financial activity of the organized fraud scheme under investigation.

**VICTIMS WHO SENT MONEY TO PALMEDGE CONSTRUCTION**

43.    M.D. was contacted in May 2026 regarding a fictitious Amazon alert claiming M.D.'s social security number was compromised. When M.D. contacted the tech support number provided in the fictitious alert, she was connected to a male claiming to be a United States Secret Service agent calling himself Agent Jack Sheehan. "Sheehan" convinced M.D. that her bank account was compromised and instructed her to liquidate her funds and complete a cashier's check for the United States Treasury to hold the funds for safekeeping. The suspect told M.D. to tell her bank that the withdrawals were for real estate investments. In total, M.D. withdrew and sent $259,658.95 via Cashier's checks payable to both Palmedge Construction LLC and Vita Builders, LLC. The total was split into the following three checks:

- Check 1: $92,355.75 (May 19, 2026) – Check #3564019, Branch 0216, payable to Palmedge Construction LLC. Mailed to 424 East Central Boulevard, Unit 120, Orlando, FL, 32801 (UPS Store).

- Check 2: $79,352.75 (May 28, 2026) – Check #3565255, Branch 0245, payable to Palmedge Construction LLC. Mailed to 424 East Central Boulevard, Unit 120, Orlando, FL, 32801 (UPS Store).

- Check 3: $87,950.45 (June 22, 2026) – Check #356316, Branch 0245, payable to Vita Builders LLC. Mailed to 127 West Fairbanks Avenue,

21

Winter Park, Florida 32789 (UPS Store identified as holding a Vita Builders LLC PO Box).

44.    K.N. was on her computer when she received multiple alerts that her computer had been compromised, and she needed to contact Microsoft.

    a.  K.N. called the number displayed in the alerts and was connected to someone who fraudulently identified themselves as Microsoft Fraud Agent Leena Cole.

    b.  "Cole" connected to K.N.'s computer via UltraViewer and began showing her some files on her computer that had been compromised.

    c.  "Cole" then advised K.N. that her cellular device was also compromised.

    d.  K.N. completed cashier's checks and wire transfers to different accounts. First, K.N. requested and sent a cashier's check of $130,000 to Eliteken Construction Inc (No other information), and a wire transfer to Joe Watkins in Ardmore, Oklahoma.

    e.  K.N. was instructed to mail another cashier's check payable to Palmedge Construction LLC for the amount of $150,000.00.

    f.  K.N. continued to receive additional phone calls and mailed physical cash to various addresses.

45.    While conducting physical surveillance on June 10, 2026, law enforcement observed LUO place two UPS shipping boxes within a trash can outside of 2423 South Orange Avenue, Orlando, Florida. These boxes were eventually

22

recovered. The label indicated that the package had originated from a C.C. from Tonawanda, New York.

    a. Using investigative means, C.C.'s identity was verified, and the Tonawanda Police Department was dispatched to her home address in an attempt to speak with her and gather information regarding the package.

    b. C.C. became dismissive when speaking with her local police department, advising that she had not been scammed and that she had not sent any money.

    c. C.C. informed the Tonawanda Police Department that she had been contacted by someone attempting to persuade her to invest money in bitcoin and other cryptocurrencies, and that she had been provided with the shipping information for Palmedge Construction, LLC, so she could send the cashier's check.

    d. C.C. told Law Enforcement that she only sent an empty box to get them to leave her alone. In my training and experience I believe that C.C. was likely coached not to speak with police or anyone else regarding the transfer, as documented in the previously outlined incidents

23

## SHOUXIN LUO – IRONPALM BUILDERS LLC



46.    Per the Florida Division of Corporations, LUO established Ironpalm Builders, LLC in January 2026. The corporation is currently listed as active and solely lists LUO as its registered agent. The principal address is listed as 37 North Orange Avenue, Unit 210, Orlando, Florida, 32801. This address is the location of Expansive Workspaces, a shared office workspace that offers individual offices and shared spaces for rent from within the building.

47.    Ironpalm Builders LLC has been utilized in the furtherance of the scheme in multiple documented incidents. In total, there is at least $1,386,097.04 in documented, confirmed wire transfers and cashier's checks sent to Ironpalm Builders LLC from victims associated with this investigation. Ironpalm Builders LLC has not been identified as a permit holder for any construction projects. Financial records linked to Ironpalm Builders LLC show substantial deposits that were transferred to bank accounts in China and Bahrain. There is no indication that the company has

24

incurred any legitimate expenses consistent with construction operations, such as purchasing materials, subcontracting, equipment, or even payroll. Based on the totality of the investigation, Ironpalm Builders LLC appears to be operating as a shell company being used to receive and redistribute proceeds obtained through the fraudulent scheme.

48. The following accounts have been identified as financial accounts associated with LUO, and Ironpalm Builders, LLC:

*Truist Bank Account #4037, Ironpalm Builders, LLC Account*

49. Records obtained from Truist Bank identified a business checking account ending in 4037 as belonging to Ironpalm Builders, LLC. The account was opened on February 9, 2026, as a Simple Business Checking account.

50. A review of the account activity showed that, with the exception of a $94.02 ACH transfer between Ironpalm Builders LLC accounts, the account was funded almost entirely through victim funds received via deposited cashier's checks and incoming wire transfers.

51. In total, the account received or attempted to receive approximately $454,500.00 in suspected victim funds. Specifically, the account received:

    a. a $30,000.00 cashier's check from victim K.P. on May 11, 2026,

    b. multiple wire transfers totaling $94,000.00 from R.O.,

    c. $40,000.00 from K.G.,

    d. $38,000.00 from G.H.,

    e. $79,000.00 from C.K.,

    f.  $90,000.00 from T.S.,

    g.  $83,150.00, initiated by L&M Berry Family LLP

    h.  $48,500.00 from J.H.; and

    i.  $34,650.00 from S.P.

The amounts described in paragraphs (h) and (i) were ultimately returned before being credited to the account.

52.    The account activity did not reflect the normal expenditures expected of a legitimate construction business. There were no identifiable payments for payroll, subcontractor labor, building materials, equipment, insurance, utilities, rent, taxes, or other customary operating expenses associated with construction services. Aside from a nominal ACH transfer between Ironpalm Builders LLC accounts, most funds leaving the account were sent via international wire transfers.

53.    Between March 23, 2026, and May 20, 2026, the account initiated seven international wire transfers totaling approximately $455,400.00.

    a.  Two wire transfers totaling $89,800.00 were sent to Veyra Tech Limited in Hong Kong,

    b.  one wire transfer of $37,000.00 was sent to Hongyin Trade Limited in Hong Kong, and

    c.  four wire transfers totaling $328,600.00 were sent to Krasmata Limited in Bahrain.

The amounts transferred overseas closely correspond to the victim's funds deposited into the account during the same period.

54.     I believe LI contacted Truist Bank and appeared to present himself as LUO to inquire about the account being locked and issues he was having while attempting to initiate additional wire transfers from his mobile device. This belief is based on a review of the recording of the phone call purportedly from LUO. However, LUO has always been accompanied to banks by LI during our surveillance, and on every occasion, LI spoke on behalf of LUO. It is believed that LUO does not speak English. This action by LI further demonstrates LI's control over the account.

*Truist Bank Account #4120, Shouxin Luo Personal Account*

55.     Records obtained from Truist Bank identified the checking account ending in 4120 as belonging to LUO. The account was opened in January 2026 with an initial deposit of $100.00.

56.     A review of the account activity revealed that, during the subpoenaed time period, the account was not utilized for ordinary personal banking activities. The transaction history did not reflect expenditures commonly associated with a primary personal checking account, such as food, fuel, housing, utilities, insurance, or other routine living expenses. Additionally, there were no routine deposits consistent with what one would receive when actively employed. Instead, the account remained largely inactive following its opening.

**VICTIMS WHO SENT MONEY TO IRONPALM BUILDERS, LLC**

57.     Y.M., who was 81 years old during the relevant time period, sent money to Ironpalm Builders, LLC between October 23, 2005 and June 2026.

27

a. On June 10, 2026, while conducting surveillance, law enforcement located the suspects picking up packages from the UPS Store located at 2423 South Orange Avenue, Orlando, Florida, 32806.

b. LUO was observed leaving the store in possession of several shipping boxes. Prior to reentering the vehicle, he discarded the shipping boxes in the trash can outside of the establishment.

c. Law enforcement collected the discarded mail and identified one of the packages as originating from Y.M. in Chandler, Arizona. Local police were contacted, and the Chandler Police Department generated a report regarding her involvement. It was discovered that Y.M. has been a victim of the scheme since October 23, 2025.

d. Between October 23, 2025, and June 10, 2026, Y.M. sent approximately $612,000 in currency, gift cards, and cashier's checks to the suspects. Y.M. advised that she began receiving calls from an individual falsely representing themselves as an FBI Agent, who instructed her to withdraw cash and place it in a box for pickup. She was later instructed by "FBI Agent Daniel Blackwell" to send a $40,000 cashier's check to Ironpalm Builders, LLC, and was given the 2423 South Orange Avenue, Orlando, Florida address for UPS delivery.

58. M.N., who was 80 years old during the relevant time period, sent money to Ironpalm Builders, LLC between May 11, 2026 and May 21, 2026.

28

a. M.N. is a United States Army veteran and reported being the victim of a government imposter scam.

b. M.N. stated the scheme began after he encountered a fraudulent Apple Security pop-up message, which led him to contact individuals posing as federal law enforcement and government officials.

c. The suspects falsely represented themselves as affiliated with the Drug Enforcement Administration (DEA), Internal Revenue Service (IRS), Financial Crimes Enforcement Network (FinCEN), and the Federal Trade Commission (FTC).

d. One of the primary suspects identified himself as "Stephen Roy" and utilized the telephone number (202) 413-5009.

e. The suspects falsely advised M.N. that his identity had been used to purchase illegal narcotics in Michigan and was connected to a warehouse in Kane County, Illinois, as well as bank fraud and other criminal activity.

f. They instructed M.N. that his funds needed to be secured in a "United States Treasury lockbox" while a new identity was created for him.

g. To further the scheme, the suspects provided M.N. with fraudulent documents, including a counterfeit United States Treasury check and a fake "Notice of Clearance," to convince him the investigation was legitimate.

29

   h. On May 11, 2026, M.N. obtained a cashier's check in the amount of $56,125.00 payable to Ironpalm Builders, LLC, addressed to 2423 South Orange Avenue, PMB 389, Orlando, Florida 32806, and sent it via overnight FedEx.

   i. M.N. later realized he had been the victim of a fraud scheme and reported the incident to the West Dundee Police Department in Illinois under report number 26-3835. He also filed a complaint with the Federal Trade Commission on May 26, 2026.

   j. Video surveillance recorded on May 12, 2026 from the UPS Store at 2423 South Orange Avenue, Orlando, Florida captured LI and LUO picking up a package and then meeting WANG outside.

59. S.S. received earbuds in an Amazon package that she had not purchased. Susan was advised that her account had been frozen and was provided with the phone number (833) 515-0063. She spoke briefly to an individual named "Harmony," but was ultimately transferred to another number, (202)-202-2977. After the transfer, S.S. spoke with a "Benjamin Wiseman", who advised her that her accounts have been compromised and that she had been linked to money laundering at US Bank, Citibank, and Truist.

   a. S.S. was asked to obtain a cashier's check for $32,376.12, payable to Ironpalm Builders, LLC.

   b. S.S. was given strict instructions commonly provided in these schemes, including:

      i. Don't mention this to anyone, and

      ii. Stay on the phone with me while you go to the bank.

c. S.S. was provided with an Orlando address to which she should mail the cashier's check.

d. S.S. became aware that she was likely being scammed and began working to recover her check before delivery.

      i. S.S. successfully canceled the delivery and received it back, at which time she voided the cashier's check.

      ii. S.S. then began receiving additional phone calls from (916)-461-6400, during which an individual posing as a representative of the Folsom County Sheriff's Office advised her that she had a warrant for her arrest for failing to mail the cashier's check.

60. K.P. was identified as a potential victim while reviewing records for the UPS store where Ironpalm Builders, LLC is confirmed to have a PO Box.

a. It was believed K.P. sent a cashier's check to Ironpalm Builders, LLC, but this information had not been confirmed.

b. Upon receiving financial records from Truist Bank regarding the financial accounts linked to Ironpalm Builders, LLC, there was evidence K.P. sent a $30,000.00 cashier's check on May 11, 2026.

c. Attempts to contact K.P. have been unsuccessful.

    d. While law enforcement has not been able to get a statement from K.P., the totality of the evidence and lack of deviation from the known scheme provide evidence that she has been victimized.

61.    D.G. began receiving phone calls from an unknown number where someone identified themselves as Amazon customer support and that there was suspected fraudulent activity on her account.

    a. D.G. was then transferred to what was asserted to be Amazon's fraud department, where she was asked to provide her contact information, and that she would receive a call back from the Federal Trade Commission Chief Investigator, Andrew Ferguson.

    b. D.G. later spoke with a male who fraudulently identified himself as "FTC Chief Investigator Andrew Ferguson".

    c. D.G. spoke with this male several times over phone calls, text messages, and email.

    d. "Ferguson" eventually coached and convinced D.G. to send money from her account to protect it from fraudulent activity.

    e. D.G. withdrew money from her 401(k) retirement savings account and requested a cashier's check for $44,800, payable to Ironpalm Builders, LLC.

    f. D.G. was advised to send the cashier's check via FedEx and was provided with the address of 2423 South Orange Avenue, Orlando, Florida as the location for delivery.

32

g. D.G. became suspicious and contacted the Normal Police Department, which attempted to assist her in recovering the cashier's check.

    i. It was discovered during the investigation that D.G. incorrectly filled out the delivery address, and did not include the PO Box number, which caused the package to be rejected by the UPS store.

    ii. The cashier's check was eventually returned to D.G., and she voided it.

62. M.B. advised she was playing Solitaire on the internet when a pop-up style notification appeared advising that she had been hacked and a loud siren began playing over her computer speakers.

a. The pop-up advertisement could not be closed, and it stated that turning off the computer would delete all data.

b. The pop-up provided a phone number that was allegedly for Microsoft.

c. M.B. began looking for Microsoft's legitimate phone number but became frustrated by the alarm, which she could not disable.

d. M.B. called the number displayed on her computer screen. The person who answered simply stated "Microsoft."

e. When M.B. explained the reason for her call, she was transferred to someone posing as a technician who would help her fix her computer.

33

f.  The unidentified male advised her that her computer was confirmed to have been hacked and that there was a debit pending for a charge of $66,000 for a pornography website.

g.  M.B. was then transferred to another male, who identified himself as Joseph Ryan. He claimed to represent the fraud department of her bank, Southstate Bank.

h.  Ryan began coaching her to complete a wire transfer to protect her assets.

i.  M.B. became hesitant because it sounded like she was being scammed.

j.  "Ryan" said: "we're in this together" and "you're helping catch the bad guys."

k.  M.B. remained on the phone with the male for the entire day and eventually completed a $12,847.96 wire transfer to Ironpalm Builders, LLC in Orlando, Florida from her account "L&M Berry Family, Limited Liability Partnership."

l.  To further lend credibility to the scheme, the suspects provided M.B. with a fraudulent letter purporting to be from the Federal Reserve.

m.  They instructed her not to disclose the matter to anyone. Believing the representations to be legitimate, M.B. authorized another wire transfer of $48,500.00 to an account held by Ironpalm Builders, LLC at Truist Bank, ending in 4037.

34

n. This appears to have been done in an attempt to manipulate M.B. into sending additional currency at a future date, essentially keeping the scheme going and continuing to drain funds from her accounts.

o. M.B. became concerned and contacted the Federal Bureau of Investigation, froze her credit, and contacted her bank the next morning.

p. Southstate Bank was able to reverse the wire transfer and return the funds to M.B.

q. M.B. continued to receive multiple calls from the same individuals and had to block numerous numbers.

r. A review of the above-mentioned bank records for Truist Bank Account #4037 indicates that an $83,150.00 wire transfer was initiated by L&M Berry Family LLLP (M.B.). This wire transfer was ultimately reversed before the funds could be deposited in the Truist Bank Account controlled by Ironpalm Builders, LLC. While the amount mentioned by M.B. during her reporting is incorrect, this wire transfer was ultimately reversed, providing consistency with her statement and the fact that she was able to reverse the wire transfer successfully.

63. E.U. received a call from "Alex", an individual alleging to work for McAfee Security.

a. E.U. was offered a cheaper upgrade to his current subscription, which would result in a refund of $299.00.

35

b. They collected his Social Security information, his driver's license, and fabricated an overpayment on the agreed-upon refund amount, claiming they had accidentally sent $28,642.00 to his account.

c. E.U. obtained a certified check and was instructed to send $28,300 to Ironpalm Builders, LLC.

d. E.U. was provided with instructions similar to those given to S.S., such as being advised not to tell anyone, and being kept on the phone while he was inside the bank.

e. E.U. received additional phone calls, claiming the check was torn and void and that he needed to send another form of payment.

f. E.U. spoke with his son, who reported the incident to the bank and his credit card companies.

64. C.G. received a prompt on her Apple TV to call (855)-670-5045 in reference to suspicious activity on her account.

a. C.G. was advised that someone had utilized her Apple Pay account and paid $149.99 for pornography in China.

b. She was allegedly connected to Bruce J. Phillips from the Federal Trade Commission who provided her with a case number and advised that the incident had been documented.

c. C.G. was then transferred to another male who identified himself as Ryan Adams and claimed to represent her bank, Integrity Bank & Trust.

36

d. Adams provided her with a "dummy account," advising that it would keep her money safe if she sent it there.

e. Gardner then completed a wire transfer of $49,500.00 to Ironpalm Builders, LLC in Orlando, Florida.

f. C.G. was not able to recover the funds for this incident.

65.    Based on my training and experience investigating organized financial crimes, these facts are consistent with the operation of a shell company established to receive, conceal, and launder proceeds derived from fraud. The absence of legitimate business activity, combined with the repeated use of Ironpalm Builders, LLC as the designated payee for unrelated fraud victims, the rapid movement of victim funds, the surveillance placing LUO in possession of victim packages, and LUO's sole ownership and control of the company demonstrate that both LUO and Ironpalm Builders, LLC are knowingly tied to and actively facilitate the fraudulent scheme rather than serving as innocent recipients of victim funds.

## ACCOUNT CLOSURES – INTRODUCTION TO ZHAO AND LU

66.    During surveillance, law enforcement identified that several accounts associated with this scheme had been closed due to suspicious activity by various financial institutions.

67.    ZHAO and LU appear to have been brought into the scheme recently due to suspicious activity relating to the financial accounts controlled by LUO and WANG.

68.     Based on my training and experience, the transition from previously identified companies whose bank accounts were restricted or closed to newly formed businesses controlled by different individuals is consistent with the operational methods used by organized fraud and money-laundering organizations. Criminal enterprises commonly replace compromised companies with newly established entities to maintain the uninterrupted flow of victim funds while minimizing detection by financial institutions and law enforcement. The newly identified businesses perform the same functional role as the original companies serving as recipients of fraud proceeds, which, when viewed in conjunction with the common home addresses, financial activity, victim payment instructions, and other investigative findings, strongly indicates they are successor entities established to perpetuate the same fraudulent scheme rather than legitimate independent businesses.

69.     Because LUO and WANG have been flagged by multiple banks, they are likely having a harder time opening accounts and moving money as quickly as they would like, which is why they would focus on using accounts for ZHAO and LU to complete wire transfers.

## YUXIANG ZHAO, VITA BUILDERS LLC



70.    Per the Florida Division of Corporations, ZHAO established Vita Builders, LLC in January 2026. The corporation is currently listed as active and solely lists ZHAO as its registered agent. The principal address is listed as 109 Silver Palm Avenue, Melbourne, Florida, 32901

71.    Vita Builders, LLC has been utilized in the furtherance of the scheme in multiple documented incidents. In total, there is at least $87,950.45 in documented, confirmed wire transfers and cashier's checks sent to Vita Builders, LLC. Vita Builders, LLC has not been identified as a permit holder for any construction projects. An investigative subpoena for financial records has been served, but responses from the relevant financial institutions have not been received. Based on the victim statements obtained and the established pattern of the scheme, it is likely that any funds received are being wired directly to China or Bahrain. There is no indication that the company has incurred any legitimate expenses consistent with construction operations, such as purchasing materials, subcontracting, equipment, or

39

even payroll. Based on the totality of the investigation, Vita Builders, LLC appears to be operating as a shell company being used to receive and redistribute proceeds obtained through the fraudulent scheme.

72.    While recently brought into the organized fraud group we are actively investigating, ZHAO has been identified as involved in similar incidents dating back to November 24, 2022.

    a.    There was a completed report by the Baltimore Police Department (Maryland - Case #223280975-001) involving a victim who reported she had a pop-up on her computer and was told to call Google because she was hacked. Ultimately, M.D. was directed to wire funds into a new account for safety. The victim was provided with an account number to deposit her money into, and the account was listed in ZHAO's name.

73.    Altogether, three additional incidents have been reported to various local or federal agencies regarding wire transfers or cashier's checks mailed to a P.O. Box.

74.    Based on my training and experience investigating organized fraud groups, I believe that these cases help validate the basis that the scheme is constantly changing hands and faces and that the identified suspects have lived in various parts of the United States of America, including Florida, California, New York, and Texas. They are likely to move to different locations because avenues for opening PO boxes or bank accounts are closed after companies or local branches become aware of activity on those accounts. As a result of moving and constantly introducing

40

different individuals into the scheme or rotating who/what company is involved, it adds a layer of anonymity that may make law enforcement investigations less likely to be carried out, as it may involve multiple jurisdictions and be difficult to track down.

75.   M.D. sent one of three checks to Vita Builders, LLC. The events pertaining to M.D. are detailed in paragraph 43, above.

**HUASHAN LU, VEX BUILDERS LLC**



76.   Per the Florida Division of Corporations, LU established Vex Builders, LLC in February 2026. The corporation is currently listed as active and solely listed LU as its registered agent. The principal address is listed as 3020 West New Haven Avenue, 1st Floor, Melbourne, Florida, 32904.

41

77. There is no indication that the company has incurred any legitimate expenses consistent with construction operations, such as purchasing materials, subcontracting, equipment, or even payroll. Vex Builders, LLC appears to be operating as a shell company being used to receive and redistribute proceeds obtained through the fraudulent scheme. LU and ZHAO have recently been identified as involved in the scheme. Because it was recently identified, there are no known victims who have been specifically victimized by Vex Builders, LLC. Based on the similar naming scheme used, the lack of legitimate expenses, and the evident involvement of ZHAO in the overall scheme, this company is likely to be used in the near future to funnel funds received from victims.

78. LU has been observed in financial institutions with LI, appearing to be in the process of opening accounts. During surveillance on July 8, 2026, Detective Pantaleo observed both LU and LI enter the PNC Bank at 7225 West Colonial Drive, Orlando, Florida, in the Middle District of Florida, at approximately 1330 hours. Both individuals were inside PNC Bank for approximately one hour. Given the duration of their visit, the fact that they were taken to a private room, the known closure of several financial accounts related to this scheme, the recent introduction of LU, and my training and experience, I believe they were likely completing paperwork necessary to open a new account.

## SURVEILLANCE ON JULY 16, 2026

79. During surveillance conducted on July 16, 2026, TAC officers observed the individuals in the rear of a 2026 White Genesis, VIN KMUHCESC5TU323257

42

("TARGET VEHICLE 2") opening packages immediately after LI returned to the vehicle after exiting a UPS store. LU and ZHAO were observed in the back seat during this surveillance period. This surveillance directly evidences both LU and ZHAO being aware of the contents of the packages and the overall scheme. LU has been observed with LI inside several financial institutions for an extended period of time; at times, he is seen walking out with a folder one would receive when opening an account.



*Yong Bo Li and Huashan Lu exiting the bank with folder in hand*

80.    Additionally, on July 17, 2026, it was discovered that four additional checks were delivered to 1705 Edgewater Drive and were addressed to Vex Builder,

43

LLC. All four packages were intercepted and returned to the sender by UPS after one of the recipients notified UPS that they believed they had been scammed.

81.    It was discovered that M.V. sent a cashier's check for the amount of $82,985.42 to Vex Builders, LLC after being contacted via phone to advise her she had become a victim of identity theft and was being charged with money laundering. S.B. mailed a $77,000 cashier's check via UPS to Vex Builders, LLC. The contents of the other two packages are currently unknown, as they were returned to the senders. Attempts to contact the senders have been made.

### Financial Analysis

82.    The financial records obtained during this investigation reveal a consistent pattern of activity across the accounts controlled by members of the organization. Although the accounts were held by different individuals and business entities, each exhibited substantially similar characteristics that are inconsistent with legitimate construction businesses and consistent with the receipt, movement, and concealment of proceeds derived from organized fraud.

83.    The investigation identified business checking accounts associated with Palmedge Construction, LLC, and Ironpalm Builders, LLC, that were opened with nominal initial deposits, generally $100.00 or less. Rather than being funded by ordinary business revenue generated by construction projects or other legitimate commercial activity, the accounts were funded almost exclusively by cashier's checks and incoming wire transfers from fraud victims across the United States. Subpoenaed bank records demonstrated that these deposits correspond directly with victim

44

reports obtained during this investigation. Numerous victims were instructed by individuals participating in various impersonation schemes to obtain cashier's checks payable to Palmedge Construction, LLC or Ironpalm Builders, LLC, or to initiate wire transfers directly into accounts controlled by those businesses. The deposited amounts consistently matched those reported by victims and those documented in financial subpoena returns and victim-reported values.

84.    A review of the financial activity further revealed the absence of expenditures normally associated with legitimate construction companies. Investigators identified no meaningful payments for contractor labor, employee payroll, construction materials, equipment purchases, subcontractors, permits, utilities, insurance, fuel, taxes, or other routine operating expenses that would reasonably be expected for an active construction business. Instead, the majority of outgoing transactions consisted of international wire transfers or transfers intended to quickly remove funds from the accounts before they could be frozen or disputed/reversed.

85.    The timing of these transactions is also significant. Victim funds were routinely maintained within the business accounts for only brief periods before being transferred through international wire transactions. Collectively, the identified accounts transferred hundreds of thousands of dollars to financial institutions located primarily in Hong Kong and other foreign jurisdictions shortly after victim funds were received. The amounts transferred overseas closely correspond to the victim deposits made during the same periods.

45

86. Additionally, several financial institutions independently identified suspicious activity associated with the accounts. Bank records recovered during the investigation documented account restrictions, account closures, frozen funds, and terminated banking relationships resulting from suspicious financial activity. Shortly after these restrictions occurred, investigators identified newly formed construction companies controlled by additional members of the organization exhibiting the same characteristics as the original businesses. This transition from previously identified companies to newly established entities demonstrate an apparent effort to continue receiving victim funds while avoiding financial institution detection.

87. Based upon my training and experience investigating financial crimes, organized fraud, and money laundering offenses, the financial activity documented throughout this investigation is consistent with the use of funnel accounts established for the purpose of receiving criminal proceeds and rapidly transferring those proceeds to other individuals or entities before financial institutions can identify or recover the funds. The absence of legitimate business activity, combined with repeated victim deposits, immediate international wire transfers, account closures due to suspicious activity, and the creation of successor companies, demonstrates a coordinated financial infrastructure designed to facilitate the laundering and concealment of proceeds obtained through fraud.

88. When viewed in conjunction with the surveillance, victim statements, commercial mailbox records, corporate filings, and recovered evidence detailed throughout this investigation, the financial records establish that the identified

46

businesses were not operating as legitimate construction companies. Rather, they functioned as shell entities used to receive, transfer, and conceal fraud proceeds as part of an organized criminal enterprise.

## Physical Surveillance Timeline

### *June 9, 2026 – Physical Surveillance*

89.    On June 9, 2026, at approximately 10:20 a.m., law enforcement initiated surveillance at the UPS Store located at 424 E. Central Boulevard, Orlando, Florida, in reference to this investigation.

90.    At approximately 11:04 a.m., law enforcement observed LI enter the UPS Store wearing clothing consistent with that observed in the UPS surveillance footage from June 8, 2026, further corroborating LI as the individual previously observed accessing P.O. Box 120.

91.    LI exited the UPS Store approximately one minute later carrying a package and entered the front passenger seat of a vehicle, which was parked directly in front of the business with its hazard lights activated. During the investigation, the vehicle had already been identified as being potentially associated with the fraud scheme because its registered address matched the residence listed by WANG, the registered holder of P.O. Box 120. At that time, the identity of the driver was unknown.

92.    Law enforcement maintained surveillance of the vehicle as it departed the area. The vehicle traveled eastbound from downtown Orlando via State Road 408 before exiting onto East Colonial Drive. It continued eastbound before turning

47

south onto Lone Palm Road within a residential neighborhood in eastern Orange County. Surveillance was maintained for approximately 20 minutes before the vehicle was lost from view.

93.     The observations made during this surveillance further corroborated that LI was actively retrieving mail and packages from P.O. Box 120 and immediately transporting those items to a residential location associated with WANG, the registered mailbox holder.

*June 10, 2026 – Physical Surveillance*

94.     On June 10, 2026, at approximately 11:47 a.m., law enforcement initiated surveillance at the UPS Store located at 424 E. Central Boulevard, Orlando, Florida. At approximately 11:54 a.m., LI arrived at the location, exiting the front passenger seat of the vehicle that had been observed during surveillance on June 9, 2026.

95.     LI entered the UPS Store and exited at approximately 1200 hours after retrieving mail and packages. He returned to the vehicle, which departed the area traveling southbound on Osceola Street from East Central Boulevard. Surveillance units maintained continuous observation of the vehicle until it arrived at approximately 12:11 p.m. in the parking lot of Foxtail Coffee, located at 2453 S. Orange Avenue, Orlando, Florida.

96.     Upon arrival, LI exited the vehicle with LUO and walked directly to the UPS Store at 2423 S. Orange Avenue. At approximately 12:30 p.m., LI and LUO exited the UPS Store carrying a UPS shipping box. LUO discarded the box in a trash

48

receptacle located within the common area of the shopping plaza before both individuals returned toward the waiting vehicle.

97.    While LI and LUO were inside the UPS Store, law enforcement observed WANG and LIN exit their vehicle and remain in the immediate area while waiting for LI and LUO to return.

98.    After several minutes, WANG and LIN reentered the vehicle. LI and LUO subsequently returned from the UPS Store, entered the vehicle, and departed the area traveling northbound on Orange Avenue toward downtown Orlando.

99.    At approximately 12:53 p.m., the vehicle returned to the UPS Store located at 424 E. Central Boulevard. LI briefly exited the vehicle, entered the business, and returned to the waiting vehicle a short time later.

100.    The vehicle then traveled to Expansive Workspaces, located at 37 N. Orange Avenue, Orlando, Florida. LI exited the vehicle and entered the building, which requires keycard access for entry. Through investigative means, law enforcement officers determined that Ironpalm Builders, LLC, a business registered to LUO, lists 37 N. Orange Avenue, Suite 210, Orlando, Florida, as its mailing address. Expansive Workspaces is a shared office facility that leases individual office suites to multiple tenants.

101.    After remaining inside for a short period, LI exited the building carrying multiple parcels before returning to the vehicle.

49

*Traffic Stop During Surveillance on July 10, 2026 – Identification of suspects made*

102.  After LI returned to the vehicle, officers conducted a traffic stop based on an observed traffic violation. During the traffic stop, all occupants of the vehicle were positively identified as the previously listed individuals associated with this investigation.

103.  A review of the vehicle's insurance information revealed the vehicle was associated with the SUBJECTS' residence at 3047 Herold Drive, Orlando, Florida 32805 ("SUBJECT PREMISES").

104.  The coordinated movements of LI, LUO, WANG, and LIN between multiple UPS Store locations, together with their use of a shared office facility associated with Ironpalm Builders, LLC, further demonstrated a coordinated effort to retrieve, transport, and manage mail and packages associated with the businesses identified throughout this investigation.

*Discarded UPS Box in Trash July 10, 2026 – Additional Victims*

105.  After LUO discarded the UPS box into the trash receptacle, law enforcement maintained continuous physical surveillance of the box. Law enforcement officers did not observe any person approach, handle, or otherwise manipulate the box after it was discarded by LUO. During the surveillance operation, officers recovered the discarded box from the trash receptacle.

106.  Inside the box was a FedEx envelope and a smaller box. The FedEx envelope was addressed to Ironpalm Builders LLC and contained a shipping label indicating it was sent by Y.M. from Chandler, Arizona.

107. The smaller box had a piece of paper affixed to it displaying the following information:

> "Palmedge Construction LLC
> 424 E. Central Blvd Unit 120
> Orlando, FL 32801"

108. Inside the smaller box, I located an envelope displaying a Northwest Bank label in the upper-left corner.

109. Law enforcement requested assistance from the Chandler Police Department to conduct a welfare check and attempt to contact Y.M. at her residence in Chandler, Arizona, to determine the purpose of the shipment and the contents sent to Ironpalm Builders LLC.

110. Chandler Police Department officers contacted Y.M., who provided information regarding the events detailed in paragraph 57, above. Y.M. is 84 years old.

111. As a result of the fraudulent representations, Y.M. reported she surrendered approximately $612,000 in cash and checks to members of the criminal organization. Y.M. further advised that another suspect, identifying himself as "Daniel Blackwell," instructed her to purchase gift cards, provide the redemption codes, and ultimately mail the $40,000 cashier's check to Ironpalm Builders LLC. Y.M. believed the funds were being secured by Homeland Security.

112. During the investigation, Chandler Police Department officers observed photographs on Y.M.'s cellular phone depicting U.S. currency and corresponding

51

bank withdrawal receipts. McLain confirmed she transmitted these photographs to the suspects as instructed.

113. Y.M. further advised that she provided the suspects with personally identifying information, including photographs of her driver's license. Y.M. identified telephone numbers used by the suspects as 202-750-0285, associated with "Andrew McCabe," and 571-518-1414, associated with "Daniel Blackwell."

114. Y.M. confirmed she mailed the $40,000 cashier's check to Ironpalm Builders LLC as a direct result of the suspects' fraudulent representations. Y.M. agreed to cooperate with the investigation and any subsequent prosecution.

115. The UPS box discarded by LUO contained a shipping label indicating it was mailed by C.C. from Tonawanda, New York. Through investigative means, the sender was identified as C.C who is 74 years old.

116. Law Enforcement requested assistance from the Tonawanda Police Department to conduct an attempt to contact with C.C. at her residence to determine the purpose of the shipment and whether she had been victimized by a similar fraud scheme.

117. Tonawanda Police Department officers contacted C.C. at her residence. Officers noted C.C. appeared to display signs consistent with dementia. C.C. advised she was not a victim of a fraud scheme and denied mailing any money. At this time, it cannot be independently verified whether C.C. mailed financial instruments or funds, as C.C. was reluctant to provide additional information to law enforcement and may have been influenced by outside individuals.

118. Based on the circumstances surrounding the discarded packages, including the timing of the package pickups, the contents of the recovered shipping materials, and the established fraud scheme under investigation, your Affiant believes the packages collected by LI and other involved individuals contained checks, financial instruments, personal identifying information, or other proceeds obtained from victims through fraudulent means.

119. The recovery of shipping materials associated with potential victims located in multiple states, including Illinois, Arizona, and New York, within a short period of time demonstrates the activity is not isolated. Instead, the evidence indicates an ongoing, multi-state fraud operation involving the collection and movement of financial instruments obtained through fraudulent representations.

### *June 24, 2026 Physical Surveillance*

120. On June 24, 2026, officers conducted coordinated surveillance in furtherance of this investigation. Surveillance was established at the SUBJECT PREMISES, as well as multiple locations associated with the suspects' activities, including Florida Eye Clinic, Fifth Third Bank, The UPS Store, and TD Bank.

121. At approximately 0921 hours, LI was observed exiting the SUBJECT PREMISES while speaking on a cellular telephone and simultaneously looking at a second cellular device. LI returned to the residence at approximately 0940 hours.

122. At approximately 0942 hours, a blue Hyundai Accent departed the SUBJECT PREMISES. A records check revealed the vehicle was registered to Ethan Privat, who has not been identified as a target of this investigation.

123.   At approximately 0948 hours, LIN exited the SUBJECT PREMISES and retrieved a black bag from the driver's seat of TARGET VEHICLE 2, parked outside the SUBJECT PREMISES before returning inside.

124.   At approximately 1130 hours, a black Cadillac Escalade arrived at the SUBJECT PREMISES. The vehicle displayed an illuminated rideshare sign consistent with Uber operations. The female driver transported LI and WANG, who entered the rear passenger compartment of the vehicle. LI was observed carrying a black backpack.

125.   Surveillance units followed the vehicle to Fifth Third Bank, located at 2394 South Orange Avenue. At approximately 1145 hours, LI and WANG entered the bank. Both individuals exited Fifth Third Bank at approximately 1155 hours and walked eastbound toward The UPS Store, located at 2423 South Orange Avenue. They entered The UPS Store at approximately 1157 hours.

126.   At approximately 1159 hours, LI and WANG exited The UPS Store. Upon exiting, LI placed a large FedEx envelope into the black backpack he was carrying. LI was also observed opening additional mail while walking away from the business and discarding portions of the packaging.

127.   At approximately 1200 hours, LI and WANG re-entered Fifth Third Bank and exited approximately four minutes later. LI was observed speaking on a cellular telephone.

128.   At approximately 1207 hours, LI and WANG entered Fifth Third Bank for a second time and exited at approximately 1213 hours. The two individuals then

54

crossed Orange Avenue and walked toward TD Bank, located at 2405 South Orange Avenue, arriving at approximately 1215 hours. Surveillance units subsequently lost visual contact with both individuals within the shopping plaza.

129.   At approximately 1229 hours, officers entered TD Bank in an attempt to locate LI and WANG. Officer Gruler confirmed neither individual was inside the bank.

130.   During the surveillance operation, officers recovered mail discarded by LI from a trash receptacle located inside Fifth Third Bank.

131.   Additionally, officers captured photographs and video documenting the movements and activities of LI and WANG throughout the surveillance operation.

132.   At approximately 1515 hours, LI and WANG returned to the SUBJECT PREMISES in a black Toyota Corolla. Both individuals exited the rear passenger compartment of the vehicle, and LI remained in possession of the same black backpack observed earlier during the surveillance operation.

133.   Throughout the surveillance operation, officers maintained continuous surveillance of the SUBJECT PREMISES while additional surveillance units monitored the movements and activities of the identified suspects.

*Recovered mail discarded by Yongbo Li inside a trash can within Fifth Third Bank*

134.   Of the mail recovered, several different entities were discovered to have mailed documents to LUO with a listed address of 2423 S. Orange Ave., P.O. Box 389, which was the address of The UPS Store. P.O. Box 389 was the box at that location used by the targets of this investigation.

55

135.    These entities included the following: Central Florida Expressway Authority, Exeter Finance LLC, Wells Fargo Bank N.A., and TD Bank.

### *Exeter Finance LLC – Dated: June 11, 2026*

136.    The content of the mail from Exeter Finance LLC detailed a change of address confirmation, which changed the previous address of 117 NE 9th Ave, Deerfield Beach, Florida 33441-3515 to the new address of 2423 S. Orange Ave, Orlando, FL 32806.

### *Wells Fargo Bank, N.A. – June 8, 2026*

137.    The content of the mail from Wells Fargo Bank, N.A. detailed the closure of a credit card account ending in 7393. The letter mentioned the account no longer met their lending requirements because of a suspicious payment or account activity or money they could not collect. As a result, they were closing the card account as the date of the letter, which was June 8, 2026.

### *TD Bank, N.A. – Dated: June 15, 2026*

138.    The content of the mail from TD Bank, N.A., detailed the closing of LUO's TD Bank deposit account(s), effective immediately. TD Bank's letter asserted the decision was based on a review of their banking relationship. The letter asserted The accounts were blocked and will remain blocked until closed, and that no additional transactions would be processed.

*July 1, 2026 – Physical Surveillance*

139.    Surveillance was conducted on July 1, 2026, at approximately 0900 hours, by the Orlando Police Department's Financial Crimes Unit in furtherance of this investigation. Surveillance began at the SUBJECT PREMISES.

140.    At approximately 1100 hours, LIN and LI were observed entering TARGET VEHICLE 2, that is registered to LUO. LIN was the driver at the time of leaving, with LI seated in the front passenger seat. LUO was later found to be sitting in the backseat of the vehicle.

141.    The SUBJECT PREMISES has two driveway access points. The second access point was not covered under law enforcement's camera. It is likely LUO entered the vehicle from the rear and out of view. TARGET VEHICLE 2 was surveilled, and at approximately 1124 hours, it was observed to have parked at Chase Bank located at 801 Deauville Drive, Orlando, Florida. While inside the bank, LI was the only one observed who spoke with bank personnel. LI spoke on behalf of LUO. LI asked questions regarding LUO's bank account being frozen. The banker advised that the bank could not assist, and they would need to call a number for additional information.

142.    At approximately 1200 hours, LIN, LI, and LUO drove to the Bank of America located at 6329 West Colonial Drive, Orlando, Florida. LI and LUO were observed exiting TARGET VEHICLE 2 and standing at the ATM in front of the business. Officers observed LUO hand LI a Bank of America card, which he attempted to use at the ATM.

57

143.   LI entered the teller line but left, likely due to the extended line. He then walked over to the customer service line, where he began asking about problems he was having with accessing his account. LI was referred to call a 1-800 number to follow up.

    a.   It should be noted that prior to being provided the 1-800 number, LI had already been observed on the phone with someone. LI left the bank and paced around the parking lot while on the phone afterward.

144.   TARGET VEHICLE 2 then drove to the Good Homes Road Plaza Publix, located at 8863 West Colonial Drive, Orlando, Florida. The occupants were not observed exiting the vehicle. From that location, they were observed driving back to the SUBJECT PREMISES. Once back at the SUBJECT PREMISES, they briefly stopped to pick up WANG. The time was approximately 1245 hours.

145.   TARGET VEHICLE 2 returned to the Chase Bank at 801 Deauville Drive, Orlando, Florida, at approximately 1304 hours. LI, WANG, and LUO were observed to exit the vehicle and enter the Chase Bank.

146.   The three were observed completing checks. LI appeared to provide WANG with instructions, at which time she filled out the checks. LUO was observed overlooking.

    a.   It should be noted that, while at Chase Bank, LI was either constantly on the phone or looking in his backpack. This backpack is present during the majority of the surveillance conducted involving LI and

58

likely contains evidence relevant to this investigation. It is believed that the backpack will be found within the SUBJECT PREMISES.

147. On July 2, 2026, at approximately 0835 hours, LI was observed outside of the SUBJECT PREMISES via a pole camera. At approximately 0840 hours, LIN entered TARGET VEHICLE 2 with LI in the front passenger seat. The two left and returned at 1023 hours. At approximately 1044 hours, LIN, LI, WANG, and LUO entered TARGET VEHICLE 2. At approximately 1053 hours, they left the SUBJECT PREMISES. While the individuals were not followed leaving their residence, this occurrence shows consistency and the pattern of life documented in this investigation.

### *July 8, 2026 – Physical Surveillance*

148. On July 8, 2026, at approximately 0920 hours, surveillance began at the SUBJECT PREMISES. At approximately 1013 hours, LIN, LI, LU, and ZHAO were observed entering TARGET VEHICLE 2. At approximately 1030 hours, TARGET VEHICLE 2 was parked at PNC Bank, located at 7225 West Colonial Drive. LI and LU were observed entering the bank. They spent approximately one hour in the bank. Because the conversation was held in a private room within the bank, the exact details are unknown at this time. LU had not been previously observed during our surveillance period; it is likely that he is being utilized to assist in opening new accounts. Due to the meeting taking approximately one hour and in a private room with a banker, it is likely that an account was opened during this visit. Investigative subpoenas are being completed to verify this information.

59

149. At approximately 1204 hours, TARGET VEHICLE 2 was observed to have traveled to the Truist Bank located at 5025 West Colonial Drive. TARGET VEHICLE 2 then departed the parking lot, leaving LI and ZHAO in the bank. Resources available at the time did not allow us to follow them into the bank. At approximately 1224 hours, the two exited the bank and were picked up by TARGET VEHICLE 2.

150. At approximately 1239 hours, TARGET VEHICLE 2 was observed arriving at the U.S. Post Office located at 1705 Edgewater Drive, in Orlando, Florida. LU and LI exited TARGET VEHICLE 2 and entered the post office briefly. The two exited with mail in hand.

151. TARGET VEHICLE 2 was followed from the U.S. Post Office at 1705 Edgewater Drive to the UPS Store at 127 West Fairbanks Avenue, where it parked at approximately 1256 hours. LI was the only one to exit TARGET VEHICLE 2 and enter the UPS store.

152. TARGET VEHICLE 2 was surveilled, and at approximately 1310 hours, it was observed parked at the Truist Bank located at 400 South Park Avenue. LU, LI, and ZHAO exited the vehicle and entered the bank. Detective Pantaleo entered the bank and began surveilling the suspects, who were observed completing a transaction. Based on the questions asked, the discussion appeared to include a money market account. An investigative subpoena will be completed to verify this information. LI was observed laughing with the teller over what his return would be

60

if the account had one billion dollars. LI then continued to ask whether he would still be able to deposit checks into this account after this transaction.

    a. At face value, that question may not have been out of the ordinary, but when reviewing recovered mail and known information regarding the closing of specific accounts they are using in furtherance of the scheme, it seemed that LI was nervous that the account could be closed. The suspects returned to TARGET VEHICLE 2 and left the parking lot while still being surveilled.

153. At approximately 1330 hours, LU, LI, and ZHAO were observed exiting TARGET VEHICLE 2 at the Wells Fargo Bank located at 950 North Orlando Avenue. Sergeant Glatthorn observed LI exchange paperwork with ZHAO and LU in the parking lot prior to entering the bank.

154. LI was observed outside of the bank smoking a cigarette; ZHAO was approached inside by bank manager M.P., who began to ask ZHAO questions regarding a wire transfer ZHAO was attempting to complete. ZHAO directed all the questions asked to LI. When LI entered the bank a short time later, he was approached by M.P. and R.S. A law enforcement officer inside the bank overheard R.S. tell LI that R.S. remembered LI from other transactions at the Wells Fargo on Lee Road. LI acknowledged that they had previously met. ZHAO was observed to be on the phone while LI completed paperwork with the teller. M.P. could be overheard saying it would be "hard because it's China," indicating to me that this

incident is consistent and relevant to the overall scheme actively being investigated. Surveillance concluded on this date when the suspects exited Wells Fargo.

*July 16, 2026, Surveillance*

155. Law enforcement officers conducted surveillance on July 16, 2026 at the SUBJECT PREMISES. Surveillance began at approximately 9:00 am at the SUBJECT PREMISES. At approximately 11:09 a.m., LIN (Driver), ZHAO (Passenger side, rear seat), and LU (Driver's side, rear seat) were observed to have entered TARGET VEHICLE 2. At approximately 11:12 a.m., LI entered the vehicle via the front passenger door.

156. At 11:13 a.m., TARGET VEHICLE 2 began moving with all occupants still inside the vehicle and still seated in the same positions described above. At 11:30 a.m., the vehicle arrived at the UPS store located at 501 North Orlando Avenue, Suite 313, in Winter Park, Florida 32789. At 11:34 a.m., LI, wearing his backpack, was observed exiting the vehicle, entering the UPS store, and then returning to the vehicle. The vehicle, still occupied by the individuals described above, left the parking lot and began traveling eastbound on Orlando Avenue. While the vehicle was in motion, Law Enforcement observed the occupants in the back seat ZHAO and LU opening packages that were likely obtained by LI inside the UPS store.

157. At approximately 11:42 a.m., LI, ZHAO, and LU entered the Wells Fargo located at 950 North Orlando Avenue, Winter Park, Florida, 32789. LI was observed exiting while on the phone at approximately 11:45 a.m. LI remains on the phone before returning inside a few minutes later. At approximately 12:00 p.m., LIN

entered the Wells Fargo before returning to the vehicle at approximately 12:05 p.m. At approximately 12:26 p.m., LI, ZHAO, and LU exited Wells Fargo and reentered the vehicle.

158. At approximately 12:34 p.m., the vehicle parked near the Bank of America located at 250 South Park Avenue in Winter Park, Florida. LI, ZHAO, and LU entered the Bank of America. At approximately 12:38 p.m., LI was observed outside and on the phone. LI paced around the area and remained on the phone for approximately 6 minutes before reentering the Bank of America. LIN exited the vehicle. He entered the bank for a few minutes before returning to the vehicle. At approximately 1:15 p.m., LI exited the bank, returned to the vehicle to retrieve his backpack, and then reentered the vehicle. At approximately 1:29 p.m., LI, ZHAO, and LU exited the bank and returned to the vehicle.



*Yongbo Li, Yuxiang Zhao, and Huashan Lu exiting the Bank*

159.   At approximately 1:42 p.m., TARGET VEHICLE 2 arrived at the PNC Bank located at 1000 North Orlando Avenue. ZHAO, LI, and LU were observed entering the bank shortly after. At approximately 1:51 p.m., LIN exited the vehicle and entered the bank for approximately 4 minutes before returning to the vehicle.

160.   Based on my training and experience investigating financial crimes, I believe it is likely that both LU and ZHAO were opening bank accounts with PNC Bank. All three individuals spent an extended amount of time within the bank. ZHAO was the first to exit at approximately 2:02 p.m. ZHAO was in possession of a PNC folder at the time he exited. This type of folder is commonly provided by financial institutions when opening new accounts, as they usually include a copy of the account details and other onboarding paperwork.

161.   At approximately 2:15 p.m., LU and LI both exited the bank and reentered the vehicle. At the time they exited, LU was in possession of the same style of folder that ZHAO was observed exiting with.



*Huashan Lu, and Yongbo Li exiting PNC Bank*

64

*162.*    This observation is significant because it occurred after it is believed financial institutions associated with Palmedge Construction, LLC, and Ironpalm Builders, LLC had frozen and closed accounts because of suspicious activity. This conduct is consistent with the fact that ZHAO and LU appear to have been brought in to establish successor shell companies and banking relationships to continue the scheme, thereby enabling the receipt and transfer of proceeds of fraud.

### *Surveillance Summary*

163.    Additional surveillance techniques were employed throughout this investigation. The individuals involved maintained a consistent routine and schedule. They were observed traveling together to and from financial institutions and shipping facilities. There was no evidence during our investigation to establish that any of the individuals observed were actively employed by any legitimate means. Regardless of what day surveillance occurred, the type of locations traveled to remain the same, which indicates this is likely a daily occurrence.

## III.    CONCLUSION

174.    I submit that based on my training, experience, and the facts as set forth in this affidavit, there is probable cause to obtain an arrest warrant for WANG, LUO, LIN, LU, ZHAO, and LI for committing the federal offense of Conspiracy to Commit Mail Fraud, in violation of 18 U.S.C. § 1349.

This concludes my affidavit.

_____
Charles Johnsten
United States Postal Inspector
U.S. Postal Inspection Service

Affidavit submitted by email and attested to me
as true and accurate via ~~telephone or video conference,~~ in person
consistent with Fed. R. Crim. P. 4.1 and 4(d)(3), before me
this __29th__ day of July, 2026.

_____
LESLIE HOFFMAN PRICE
United States Magistrate Judge

66